## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

GERALD NELSON, et al.,

                Plaintiffs,

      vs.                               Case No. 04-C-0193

MILWAUKEE COUNTY, et al.,

                Defendants.

## PLAINTIFFS' BRIEF IN OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO MILWAUKEE COUNTY'S MOTION FOR JUDGMENT ON THE PLEADINGS

### INTRODUCTION

The State and County defendants have each filed motions to dismiss plaintiffs' fourth amended complaint. The motions assert that plaintiffs have failed to state legal claims upon which relief can be granted and also that the plaintiffs lack standing to make these claims. The motions to dismiss based on legal sufficiency were anticipated and plaintiffs actually welcome the opportunity to clarify these dispositive issues before going forward with the process of class certification and further discovery. That was the whole purpose of the stipulation that resolved the pending motion to file the fourth amended complaint. It was hoped that clarifying the issues would in turn simplify the class certification decision. In addition, the State seeks to dismiss one aspect of the case based on Eleventh Amendment immunity. This was also anticipated.

Unfortunately, the defendants' other assertion that the case should be dismissed for lack of standing creates some unanticipated procedural issues. Standing in class actions is determined with reference to the class as a whole rather than simply looking at the potential impact on the

named plaintiffs. Pursuant to the stipulation, plaintiffs' class motion has been denied with leave to refile after these pending motions are decided. This creates an endless procedural loop. Rather than return immediately to the class motion, plaintiffs have a suggestion for resolving this awkward situation. First, the Court should consider whether the allegations in the fourth amended complaint support standing based only on the claims of the individual plaintiffs. If so, the plaintiffs will prevail on standing without further analysis. If not, the second step would be to determine whether the class allegations in the complaint support standing based on the claims of the putative class. Once again, if this step is satisfied, the plaintiffs simply prevail on standing. If not, the only proper course is to deny the defense standing motions at this time with leave to refile after plaintiffs' request for class certification is decided.

The procedure governing the other aspects of the defense motions is much more straightforward. The Court can conduct its customary inquiry into whether the claims are legally sufficient and whether plaintiffs can prove any set of facts in support of the allegations of the complaint. Plaintiffs are filing three affidavits and a number of exhibits at this time. The purpose of these affidavits and plaintiffs' previous submissions is not to convert the pending motions into motions for summary judgment, but rather to show that plaintiffs will be able to prove facts in support of their fourth amended complaint.

Plaintiffs will first review the legal basis under each of the three applicable statutes since this will simplify the later discussion of standing and the State's Eleventh Amendment defense. The plaintiffs have alleged legally sufficient claims under the Americans with Disabilities Act, §504 of the Rehabilitation Act and 42 U.S.C. §1396(a)(30)(a), and will be able to prove a set of facts in support of these claims. The plaintiffs have standing to bring these claims and the Eleventh Amendment does not present any obstacles to the relief that they are seeking.

# STATEMENT OF ISSUES

I.  Plaintiffs have stated claims upon which relief can be granted under the Americans with Disabilities Act and §504 of the Rehabilitation Act.................................................11

    A.  Intentional discrimination and disparate impact under the ADA and §504......................13

    B.  Effective access to public services under the ADA and §504...........................................15

    C.  The right to integrated services under the ADA and §504................................................16

    D.  Reasonable accommodation under the ADA and §504.....................................................17

II.  Plaintiffs have stated claims upon which relief can be granted under 42 U.S.C. §1396(a)(30)(A) of the federal Medicaid statute...................................................................18

III. The individual plaintiffs, as well as the members of the putative class, have standing to bring the legal claims set out in the fourth amended complaint........................................................20

    A.  Group home residents have a legitimate interest in continuing to live in a particular home of their choice.....................................................................................................................22

    B.  The individual plaintiffs have standing...........................................................................23

    C.  The putative class members have standing......................................................................24

    D.  If the issue cannot be resolved in plaintiffs' favor at this stage of the proceedings, the portions of the defense motions relating to standing should be denied with leave to refile after the class certification question is resolved.............................................................25

IV. Plaintiffs' claims for injunctive relief which may result in an order directing the State defendants to increase future capitated rates payable to Milwaukee County are not barred by the Eleventh Amendment................................................................................................................25

    A.  There is no State immunity for claims under §504...........................................................26

    B.  *Ex Parte Young* permits an action for injunctive relief against the State defendants under the ADA, §504 and 42 U.S.C. §1396(a)(30)(a)..................................................................26

    C.  Plaintiffs are not pursuing any claims under the ADA or 42 U.S.C. §1396(a)(30)(a) other than those that come within the *Ex Parte Young* doctrine...................................................28

## PROCEDURAL BACKGROUND

The original complaint was filed in State Court on January 28, 2004 and was removed on February 25, 2004. [Dkt 1]. The only parties were Plaintiffs Nelson and Bzdawka and Defendant Milwaukee County. *Id.* Two additional plaintiffs living in homes operated by the same provider were added in the first amended complaint on April 13, 2004. [Dkt 18]. Milwaukee County then raised the issue of the State's participation as a necessary party and that led to the second amended complaint on April 30, 2004. [Dkt 23]. A third amended complaint added additional plaintiffs. [Dkt. 37]. Two of them, Lenore Czarnecki and John Gorton, are served by another residential provider, but the issues are similar. Other plaintiffs added at that time who receive different types of Family Care services were subsequently dismissed as part of a stipulation in order to limit the issues in the case. [Dkt. 50]. Counsel attempted to reach a stipulation defining the legal issues further in order to avoid a further amendment, but were not successful. This led to a motion to amend in order to permit the filing of a fourth amended complaint. [Dkt. 51]. A class certification motion was also filed at this time. [Dkt. 54]. Counsel were then able to reach a stipulation permitting the amendment and suggesting a roadmap for further proceedings. [Dkt. 58]. Defense counsel insisted that dispositive motions be heard first and that the class certification issue be deferred and that is what the stipulation provided. [Dkt. 67]. The State and County defendants have now filed their motions to dismiss. [Dkt. 68 & 70].

## STATEMENT OF FACTS

The factual history provided by the State defendants is a reasonably complete summary of the factual allegations and issues in the case. This is intended to supplement the State's version rather than to replace it. Plaintiffs are filing three affidavits along with this brief. There is a supplemental affidavit from Lincoln Burr, executive director of Homes for Independent Living.

[Burr-II]. Plaintiffs Nelson, Bzdawka, Ehrlichman and Berdikoff live in HIL homes. There is an affidavit from Dr. Gerald Kallas, president of Senior Residential Care of America. [Kallas]. Plaintiffs Czarnecki and Gorton live in SRCA homes. There is also an affidavit from Thomas Cook, an expert on disability services and disability funding programs. [Cook]. The following will also reference portions of previous affidavits and other submissions.

<u>Funding Developments at the State and County Level</u>

The State increased Milwaukee County's Family Care comprehensive rate from $1,810.61 for calendar year 2004 to $2,055.01 for calendar year 2005. www.dhfs.state.wi.us/LTCare/StateFedReqs/CapitationRates.htm. This is the second highest rate increase in the history of Family Care. [Cook: ¶36]. However, most of the other Family Care counties still receive higher rates in comparison to Milwaukee. For example, the comprehensive rates for 2005 are: Fond du Lac County - $2,120.74, La Crosse County - $1,828.82, Portage County - $2,320.75 and Richland County - $2,140.30. The "intermediate" rates which covers many fewer individuals, those who have lesser services needs, are the same for all counties and are as follows: 2001 - $628.79, 2002 - $640.00, 2003 - $657.40, 2004 - $674.49, 2005 - $691.35. (All of this data is from the above- referenced web page.)

In the wake of the rate increase, residential providers in Milwaukee County anxiously awaited word on how the Milwaukee County Department on Aging (MCDA) would allocate the funds locally. Much of what we know about this comes from MCDA informational meetings for providers that were held on February 15 and March, 2005. Staff from Senior Residential Care of America (SRCA) attended the meeting and reported what was said. The memo, dated March 16, 2005 was previously filed as attachment A to the second Pledl affidavit. [Dkt. 53]. It will be

referenced as the "SRCA memo" or as Pledl II-Ex. A. The following quotations from the memo

are pertinent to the issue of provider payments:

•Family Care is currently trying to no longer require Family Care providers to complete a financial audit each year. This is based on the idea that, since a company's financial standing will no longer determine the payments received to care for a resident, financial audits "are an unnecessary expense." [page 7]

•Regarding [MCDA staff's] views on how businesses are expected to coexist with an "entitlement program" like Family Care, [she] stated: "I have found that businesses need to go bankrupt at least two times before they <u>learn how to run a CBRF properly.</u>" [page 8] (emphasis in memo)

•Some meeting attendees stated that potential residents were now moving into Milwaukee County and signing over their money and assets to their family members so that they can qualify to receive Family Care funding. [MCDA staff] stated that she (and almost everyone else in Family Care) knows that this practice is rampant (even though she admits that it is "illegal"). She further admitted that Family Care "is doing nothing at this time to try to stop this illegal practice." [*Id.*]

• . . . [MCDA staff] stated that all newly constructed facilities have operating costs that are too high and will not be able to afford accepting Family Care residents. [*Id.*]

•Although new facilities may offer nicer environments and amenities, "this does not equal a benefit to the FC residents," Therefore, facilities with higher costs may not be able to offer FC housing." [*Id.* at 13]

• . . . if the facilities don't receive enough compensation from FC, then we "should get more private pay residents" to help cover our operating costs. [*Id.* at 14]

• . . . because there is no private pay industry to offer DD care services, programs that offer care services for DD's receive greater financial support than care programs for seniors. [*Id.*]

MCDA staff at these meetings also explained that a new "functional" method would be

used to set provider rates beginning in April of 2005. [*Id.* at 7]. Plaintiffs' counsel recently

inquired about why the new functional rate method had not been implemented. Atty. Jorgensen

responded by letter dated July 18, 2005:

Meanwhile, Family Care has been directed to refrain from granting across-the-board rate increases unless and until the County Board approves such increases. We assume that such approval will depend on, among other things, a satisfactory

arrangement to establish risk reserves and to repay Family Care deficits which have been covered by tax levy revenues.

[Cook-Ex. I].

<u>The Effect of Funding Developments on Residential Providers</u>

Dr. Kallas is the CEO of Senior Residential Care which is the residential provider for two of the plaintiffs. His affidavit summarizes the unsuccessful efforts to obtain a Family Care rate increase at SRCA's Milwaukee County CBRFs by working with MCDA, [Kallas:¶¶16-19, 23-35], other providers, [¶¶20-21], and the State Legislature. [¶26 & Ex. D]. SRCA's Milwaukee County Family Care rate has been $2,700 per month since 2001. [¶17]. Waukesha County is not in Family Care and SRCA's facility there has operated with a monthly Medicaid waiver rate of $3,500 per month for identical services. [¶15]. Dr. Kallas reported that in a survey of other residential providers, 80% of the respondents said they were being paid below their cost of care. [¶20-21]. He has spoken with bankers who expressed a reluctance to finance residential facilities in the County because of the perception that Family Care is unstable and underfunded. [¶43]. As Dr. Kallas said on December 10, 2004: "SRCA will be forced to consider leaving the Family Care Program at some point duing 2005 if we do not receive a significant rate increase. [¶44].

Lincoln Burr is Executive Director of Homes for Independent Living which is the provider for four of the plaintiffs. His previous affidavit detailed the early stages of HIL's problems with MCDA over rate issues. [Dkt. 56]. His second affidavit describes the circumstances of HIL's entry into Milwaukee County:

> HIL developed these homes beginning in the mid-90's. HIL and Paragon were encouraged by the State to enter the County in order to serve individuals with more severe disabilities that were being transferred from the State Centers for the Developmentally Disabled and other institutions into community placements. The State and County had experienced difficulty in placing these individuals with existing programs in the County because they had significant behavioral and/or medical issues. HIL negotiated generally higher rates for these individuals

compared to existing residential providers in the County based on the need to arrange more intensive staffing patterns and utilize more highly trained staff.

[Burr II: ¶7]. The second affidavit goes on to describe the current funding situation. HIL and its associated day program, Paragon, have historically received cost of living increases from the Milwaukee County Disabilities Services Division, which serves clients under age 60, and from other Wisconsin counties. [Burr I: ¶19]; [Burr II: ¶¶9-10]. The total annual shortfall for the six Milwaukee Family Care clients in HIL homes is now $18,899.70 when compared to the Milwaukee DSD average rate and $52,187.70 when compared to the average rate paid by other counties. [Burr II: ¶4]. Milwaukee DSD has worked with HIL on a procedure to bill for MA personal care services that will increase the DSD effective rate to about the same level as the other counties. [Burr II: ¶9 & 11].

It has now been five years without a rate increase from MCDA for either HIL or Paragon as additional DSD clients continue to age into Family Care. [Burr II: ¶¶8, 13, 14 & 15]. Mr. Burr says that HIL and Paragon have been able to remain in operation in Milwaukee County despite the MCDA rate problems because of their operations in other counties. [Burr II: ¶20]. "However, we will be forced to reconsider our continued subsidy of MCDA in the near future. We cannot subsidize Family Care clients. Unless we receive significant rate increases, we will be forced to terminate our contract with MCDA." *Id.*

Thomas Cook is an expert in the field of disability services and funding systems with personal experience in Milwaukee County. [Cook: ¶¶2-11 and Ex. A]. It is his conclusion that the share of Milwaukee Family Care dollars going to residential providers in 2004 was too low and that the situation got even worse in 2005. [Cook: ¶43-45][1]. CBRFs are legitimately one of

---

[1] There is a variance between the 2005 capitated rate of $1,975.88 reported by the County in an email, [Cook - Ex. H], and the $2,055.01 rate listed on the DHFS website. Plaintiffs do not have an explanation for this. Using the higher figure would make the percentage allocated to providers even lower.

the most costly services in any system and it appears they are not receiving adequate payments from Family Care. [¶47]. Part of the basis for this conclusion came from the affidavits of Dr. Kallas and Mr. Burr. He noted that both SRCA and HIL are receiving higher rates for similar services from other counties and, in the case of HIL, higher rates from another part of the same county, DSD. [¶24-25]. In general, large providers are able to cover losses in a particular segment of their operations for a time, but for various reasons they must then either reduce or eliminate the segment that is losing money. [¶26]. Mr. Cook said:

> The rate problems with MCDA would cause any large provider to consider reducing or eliminating the number of Family Care clients. It is reasonable to predict that SRCA and HIL will leave Milwaukee County Family Care if rates do not improve. Other large providers in Milwaukee County are probably considering this option.

[¶27]. Due to inflation, five years without a rate increase "actually represents a substantial decrease in effective provider income." [¶29].

Mr. Cook noted that the plight of smaller residential providers is somewhat different. They usually cannot move to another county or pursue higher-rate clients from other counties in their Milwaukee homes and so they will simply cease operations if rates are not adequate. [Cook: ¶28]. In order to determine whether the rate structure was having any effect on providers, plaintiffs arranged for a Milwaukee accounting firm to gather data from audited financial statements filed by Milwaukee County residential providers. [¶30]. The data was then evaluated by John Villegas-Grubbs, an expert on disability funding systems from Arizona. *Id.*[2] His conclusion is that small providers in Milwaukee County are in serious financial condition and that many no longer have "going concern" status. [Cook: ¶31]. Larger providers are in better financial condition according to their audited financial statements, a fact that Mr. Cook attributes

[2] Gathering the data from the County was a lengthy process. Then Mr. Villegas-Grubbs had to perform his evaluation which was then subjected to a peer review process. Mr. Cook has reviewed a draft report and spoke to Mr. Villegas-Grubbs. Plaintiffs will submit the actual documents once they are received.

to their ability to subsidize their Milwaukee County operations from other sources. [¶¶31-32]. Mr. Cook was very critical of MCDA for planning to dispense with the audit requirement. [¶48]. "Small providers in the County are in a financial crisis. The County should continue to collect this data in order to monitor the adequacy of the residential provider rates." *Id.*

He also disagreed with the implication by MCDA staff that CBRF business failures were the provider's fault. [¶47]. Based on a variety of factors, "[b]ankruptcies among Milwaukee County providers are more likely to be caused by low rates rather than the business abilities of the provider." *Id.* Mr. Cook recognized that Milwaukee County has some legitimate reasons for wanting to use the money from the 2005 rate increase to establish a risk reserve and reimburse the tax payers. [¶49]. He then said: "However, regardless of the County's rationale, the likelihood of wide-spread business failures and larger providers leaving Family Care make it imperative that at least some of the increased State funding should go to the residential providers immediately." *Id.*

<u>The Effect of Funding Developments on the Clients of Residential Providers</u>

Significant planning and effort goes into selecting the right residential setting for a particular person with a disability. [Burr I: ¶10]. Once they are in their new home, '[c]lients develop attachments to other clients and to particular staff members in the CBRF and at their day program. The whole purpose is to develop a sense of living and working together as a family and this actually does occur." [¶12]; see [Kallas: ¶10]; and see [Cook: ¶52]. According to Mr. Cook's affidavit, this is one of the main reasons that transfers are so traumatic:

> (52)    Transfers between community-based programs put clients at risk for a number of reasons. Such transitions are not just transfers between facilities as would be the case if someone moves from a hospital bed to a nursing facility. They involve the loss of the person's home with all that implies. Clients lose relationships with other residents and staff who know them well. In moving, they lose their place in a "family", a neighborhood and a community.

(53)   It is almost a certainty that some of the Plaintiffs will need to be institutionalized if this matter is not resolved to the satisfaction of the providers and discharge and contract termination procedures go forward. The more severe heir disabilities or intense their support needs, the higher the risk is for adverse placement outcomes for the Plaintiffs.

Transfers between community placements generally have a higher failure rate than other transfers. [Cook: ¶51]. Mr. Cook concluded that being transferred to other residential settings will expose all of the individual plaintiffs "to an imminent threat of institutionalization". [¶65]. Mr. Burr made a similar statement with respect to HIL's clients. [Burr II: ¶23].

## ARGUMENT

**I.  Plaintiffs have stated claims upon which relief can be granted under the Americans with Disabilities Act and §504 of the Rehabilitation Act.**

Invoking "the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce," the ADA is designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." §§12101(b)(1), (b)(4).

*Tennessee v. Lane*, 541 U.S. 509, 516 (2004). Congress had passed §504 of the Rehabilitation Act in 1973 without an extensive statement of intent and purpose. However, two years after passage of the ADA, Congress revisited §504 and added virtually identical findings about the persistent problems causing disability discrimination in America.  Pub.L. No. 102-569, §106, 106 Stat. 4346 (1992) (codified in 29 U.S.C. §701).  Those findings include the following:

(5)     individuals with disabilities continually encounter various forms of discrimination in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and public services; and

(6)     the goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to --

(A)     make informed choices and decisions; and

      (B)     achieve equality of opportunity, full inclusion and integration in society, employment, independent living, and economic and social self-sufficiency, for such individuals.

29 U.S.C. §701(a).

Plaintiffs' claims under the ADA and §504 will be discussed together because the methods of proving discrimination are imported from one to other. *Wisconsin Correctional Service v. City of Milwaukee*, 173 F.Supp. 2d 842, 849 (E.D. Wis. 2001). The only significant difference is that §504 is limited to public entities that receive Federal financial support while Title II of the ADA applies to all public entities without regard to funding source. *Id.* Both Milwaukee County and DHFS receive Federal funds.

Numerous cases brought under the ADA and §504 involve various aspects of the Medicaid program. In one such case the defendants argued that in approving the waiver application, the U.S. Department of Health and Human Services had somehow insulated the State from liability under the ADA and §504. The court disagreed, holding:

The HCFA waivers upon which the State relies neither could have exempted QUEST from the ADA and the RA, nor purported to do so. Section 1315 authorizes the DHHS to waive various provisions of the Medicaid statute, but it does not mention the ADA or the RA. See also 28 C.F.R. §35.190(b)(3) (charging the DHHS with implementing Title II compliance procedures for programs relating to the provision of health care and social services.

*Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir. 2002), cert. denied, 537 U.S. 1105 (2003).

Defendants in cases under the ADA and §504 may assert a fundamental alteration defense based on legitimate governmental interests, however, this can rarely be determined on a Rule 12(b)(6) motion. *Michelle P. v. Holsinger*, 356 F.Supp.2d 763, 770-1 (E.D. Ken. 2005). Provided that plaintiffs are seeking adjustments to an existing program rather than the creation of an entirely new program, "whether the relief requested would result in a fundamental alteration "is a matter that can be resolved only by a careful examination of the facts and circumstances'."

*Id.*, quoting *Martin v. Taft*, 222 F.Supp.2d 940, 975 (S.D. Ohio 2002); see *Radaszewski v. Maram*, 383 F.3d 599, 614 (7th Cir. 2004) ("This is not an assessment that can be made on the pleadings.")

As the following sections will discuss, plaintiffs' complaint states legally sufficient claims under the ADA and §504 and their factual submissions[3] demonstrate that they will be able to prove facts in support of those claims.

### A.      Intentional discrimination and disparate impact under the ADA and §504.

The ADA prohibits classic discrimination involving differential treatment of persons with disabilities in comparison to persons without disabilities, *Bay Area Addiction Research v. City of Antioch*, 179 F.3d 725, 735 (9th Cir. 1999), and policies that have a disparate impact on persons with disabilities, *Regional Economic Action Program, Inc. v. City of Middleton*, 294 F.3d 35, 48 (2d Cir. 2002). Facially discriminatory government policies, without more, are sufficient to establish intentional discrimination. *Lovell v. Chandler*, 303 F.3d at 1057. When a government entity (a State in that instance), "facially discriminates against the disabled, it is chargeable with notice that federal rights are implicated by such discrimination." *Id.* Any claim that discriminatory animus is required is simply wrong. Also, it is not necessary that plaintiffs show discrimination in comparison to the general population. Unlike other previous civil rights statutes, the ADA and §504 also prohibit differential treatment within groups of individuals who

---

[3] The pending motions do not seek summary judgment, and so it is important to define the role of the affidavits and exhibits that plaintiffs have filed. Submissions of this type are made "not for evidentiary, but rather for illustrative purposes -- that is, not to establish the truth of their contents, but to show that there might be a set of facts consistent with [the] allegations in the complaint." *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704 (7th Cir. 2004). Plaintiffs believe the factual matters in the submissions are significant evidence, however, this is immaterial in the context of the pending motions. Dismissal "is proper only if there is no state of facts consistent with the complaint that would entitle the plaintiffs to relief. In submitting the [allegedly objectionable document], the plaintiffs were merely indicating that, yes, there may well be facts they could prove that would show they had a claim." *Hart v. Sheahan*, 396 F.3d 887, 895 (7th Cir. 2005) (citations omitted).

all have disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 598 (1999); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 275-6 (2nd Cir. 2003), cert. denied, 541 U.S. 936 (2004). This also applies to cases that seek systemic modifications in Medicaid-funded programs. *Makin v. Hawaii*, 114 F.Supp.2d 1017, 1033 (D. Hawaii 1999).

The plaintiffs have alleged in Counts One and Five that:

Family Care policies, procedures and rates relating to funding for AFHs, CBRFs and day programs for persons in AFHs and CBRFs as developed and implemented by DHFS, Secretary Nelson and Milwaukee County have in the past and continue to intentionally discriminate and have a disparate impact under the ADA [and §504] because:

(A)     Milwaukee County residents with disabilities who are 60 years of age and older receive substantially inferior treatment in regard to payment for services in adult family homes (AFH), community-based residential facilities (CBRF) and day programs for persons in AFHs and CBRFs in comparison to Milwaukee County residents with disabilities who under the age of 60 whose services are funded by the Community Options Program (COP), Community Integration Program (CIP) and (Brain Injury Waiver (BIW) programs instead of Family Care.

(B)     Milwaukee County residents with disabilities who are 60 years of age and older receive substantially inferior treatment in regard to payment for services in AFHs, CBRFs and day programs for persons in AFHs and CBRFs in comparison to persons with disabilities of any age who are residents of other counties that are not participating in Family Care and whose services in non-Family Care counties are funded by the COP, CIP and BIW programs.

(C)     Milwaukee County residents with more significant disabilities who are served by Family Care receive substantially inferior treatment in regard to payment for services in AFHs, CBRFs and day programs for persons in AFHs and CBRFs in comparison to persons with less significant disabilities that are served by Milwaukee County Family Care.

[4th Amd. Cmplt., ¶¶143 & 162]. Each of these three subparts supplies a clear legal basis for a finding of discrimination.

The plaintiffs, who are 60-and-over MCDA Family Care clients have alleged that they are treated differently in comparison to under-60 clients of Milwaukee County. They have alleged a significant funding disparity between the two groups that will ultimately cause the loss of their homes for the plaintiffs and many members of the putative class. [4th Amd. Cmplt. ¶¶33-36, 58-64]. The same portions of the complaint allege that Milwaukee Family Care clients are being treated differently than other similar individuals in other counties with similar effect. *Id.* Finally, the plaintiffs allege that as persons with more significant disabilities, they are being treated differently in comparison to individuals with lesser disabilities in Family Care. *Id.* Each of these represents classic differential treatment that is actionable as intentional discrimination or disparate treatment under the ADA and §504.

## B. Effective access to public services under the ADA and §504.

The ADA and §504 also require public entities to administer their programs in certain ways to ensure full access by persons with disabilities. 28 C.F.R. §35.130(b). Once again, discrimination in relation to a comparison group is not required in order to prevail. "A plaintiff can prevail either by showing 'discrimination' or by showing 'deni[al, of] the benefits' of public services." 42 U.S.C. §12132, *Henrietta D.*, 331 F.3d at 276. "[T]he statute itself does not literally require a showing of 'discrimination'." *Id.* The actionable conduct must, however, be by reason of the plaintiffs' disabilities, *Id.* at 279, but that is not an obstacle here.

Counts two and six allege:

> (148)  Family Care policies, procedures and rates relating to funding for AFHs, CBRFs and day programs for persons in AFHs and CBRFs as developed and implemented by DHFS, Secretary Nelson and Milwaukee County have in the past violated and continue to violate the ADA because they aid or perpetuate discrimination against persons with disabilities and prevent them from obtaining the same result, gaining the same benefit or reaching the same level of achievement in the most integrated setting appropriate to their needs and have the

purpose or effect of defeating or substantially impairing accomplishment of the objectives of the Family Care and Medicaid programs.

[4th Amd. Cmplt., ¶¶148 & 166]. The same allegations referenced above would also support a finding that the plaintiffs are being denied effective access to public services.

## C.    The integration requirements of the ADA and §504.

Plaintiffs are discussing their claims in the order that they appear in the complaint, but in many ways this is the most compelling. It is not necessary to show discrimination in comparison to another group under *Olmstead*, so even if the persons with disabilities in either Milwaukee County or the State of Wisconsin were also in Family Care, the plaintiffs could still pursue their claims that various systemic changes are necessary to prevent their unnecessary institutionalization.

The integration claim is based on the following regulation:

A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 CFR §35.130(d) (1998).

Another part of the DOJ Regulations defines "most integrated setting" as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 CFR pt. 35, App. A, p. 450 (1998). §504 also contains an integration requirement which is "materially identical" to the corresponding ADA provision. *Bruggeman*, 324 F.3d at 911-2.

The United States Supreme Court held that States must provide "community-based treatment" in lieu of institutional confinement to persons who choose that option. *Olmstead,* 527 U.S. at 607. However, the integration clause is not limited to individuals in institutions that are trying to get out. It also applies to claims brought by individuals living in the community to increase the funding levels for certain services or to modify the provisions of disability funding

programs where there is a risk of future institutionalization. *Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175, 1181-1182 (10th Cir. 2003).

Counts three and seven allege:

> Family Care policies, procedures and rates relating to funding for AFHs, CBRFs and day programs for persons in AFHs and CBRFs as developed and implemented by DHFS, Secretary Nelson and Milwaukee County have in the past violated and continue to violate the integration requirements of the ADA because they substantially increase the probability that Milwaukee County residents with disabilities who are 60 and over will be placed in more restrictive, less integrated settings despite their preference for less restrictive, more integrated settings.

[4th Amd. Cmplt., ¶¶153 & 171]. There are specific allegations for each plaintiff that they are likely to be institutionalized due to forced moves from their residential providers. [¶¶78-79]. The complaint also lays out the specifics of the funding dispute and how the rate issue is causing the providers to terminate their contracts with Family Care. [¶¶56-64, 72-77]. This is similar to the chain of causation leading to institutionalization submitted in *Fisher*. 335 F.3d at 1184-1185. Plaintiffs have stated a claim under the integration requirements of the ADA and §504.

**D.      Reasonable accommodation under the ADA and §504.**

This issue requires only a brief discussion. Plaintiffs are not requesting an individualized plaintiff by plaintiff modification of Family Care that is different for each person as in some reasonable accommodation situations. They seek an overall modification of Family Care policies and changes in overall funding like in *Olmstead.* That means the fundamental alteration defense is balanced against the needs of the entire client population rather than just a few applicants. 527 U.S. at 605-606. This issue is subsumed in the above discussions of discrimination, access and integration. Based on the timing of the decision in *Wisconsin Community Service v. City of Milwaukee*, --- F.3d ---, 2005WL1523215 (7th Cir. June 29,2005), plaintiffs do not know whether the defense will be arguing in their reply briefs that it has some bearing on this case. It

does not. The present case involves allegations of widespread discrimination that would meet the majority's standard in *WCS*. Also, the plaintiffs in *WCS* have requested en banc review and the Seventh Circuit has requested that the City file a response to the petition.

## II.  Plaintiffs have stated a claim upon which relief can be granted under 42 U.S.C. §1396(a)(30)(A) of the federal Medicaid statute.

Plaintiffs have also brought a claim under 42 U.S.C.§1983 alleging a violation of 42 U.S.C. §1396a(a)(30)(A). The State recognizes that this phase of the case must go forward based on controlling Seventh Circuit precedent. *Methodist Hospitals, Inc. v. Sullivan*, 91 F.3d 1026 (7th Cir. 1996). The County does not agree so the issue does require some discussion.

The federal Medicaid statute provides:

> A State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area; . . .

42 U.S.C. §1396a(a)(30)(A). Participation in the Medicaid program is voluntary, but once a state decides to do so, it must abide by all applicable federal requirements and standards *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1980). A claim may be brought under 42 U.S.C. §1983 to remedy a violation of a Federal statute provided that the statute unambiguously confers an individual right. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).

Prior to *Gonzaga*, the Seventh Circuit had held that "providers of medical care have a private right of action, derived through §1983, to enforce §1396(a)(30)." *Methodist Hospitals,* 91 F.3d at 1029. Some courts had taken another approach, finding a right of action under (30)(A) only as to Medicaid beneficiaries. *Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d

908, 927 (5th Cir. 2000); *Ark. Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 526 (8th Cir. 1993). Obviously, the plaintiffs here are beneficiaries, not providers, and they would be allowed to proceed even under the more restrictive approach.

Various cases since *Gonzaga* have found a private right of action to enforce 42 U.S.C. §1396a(a)(30)(A). In *Memisovski v. Maram*, 2004WL1878332 (N.D. Ill. 2004), District Judge Lefkow conducted an exhaustive review of the case law and concluded that recipients had a private right of action to enforce §1396a(30)(A) and other Medicaid provisions. *Ball v. Biedness*, 2004 WL2566262 (D. Ariz. 2004), found a private right of action under (30)(A) on behalf of recipients to challenge funding shortages in a community care program. *Clayworth v. Bonta*, 295 F.Supp.2d 1110, 1124 (E.D. Cal. 2003), also found a private right of action under (30)(A) specifically for recipients, but not providers, to challenge a 5% reduction in rates paid in the California Medi-Cal program. (However, *Sanchez v. Johnson*, 301 F.Supp.2d 1060, 1064 (N.D. Cal. 2004), held that (30)(A) does not create a private cause of action.)

*Sabree v. Richman*, 367 F.3d 180, 193-194 (3rd Cir. 2004), another case containing an exhaustive review of the case law after *Gonzaga*, found a private right of action under several other Medicaid provisions other than (30)(A). *Michelle P. v. Holsinger* also involved different Medicaid provisions and allowed the case proceed on those claims as well as under the ADA and §504. 356 F.Supp.2d at 760-770.

Most of the factual allegations in the complaint, most of the affidavits and most of the other documents submitted by the plaintiffs and the defendants concern the rate issue and its effect on residential providers in Milwaukee County. There is no need to catalogue them in detail here. The complaint is clearly sufficient. The affidavits and other documents set out a clear

pattern of Family Care rate problems that are affecting providers and especially the retention of providers which is one of the specific elements of 42 U.S.C. §1396a(a)(30)(A).

### III. The individual plaintiffs, as well as the members of the putative class, have standing to bring the legal claims set out in the fourth amended complaint.

"[F]ederal courts have a 'virtually unflagging obligation' to exercise the jurisdiction conferred on them by Congress." *Sverdrup Corp. v. Edwardsville Community Unit School Dist. No. 7*, 125 F.3d 546, 549 (7th Cir. 1997) quoting *Colorado River Water Conservation District v, United States*, 424 U.S. 800, 817 (1976). Standing is absent only where it is impossible for a court to grant "any effectual relief whatever." *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992). To satisfy the case or controversy requirement of Article III, "a plaintiff must allege: (1) an 'injury in fact' (2) fairly traceable to the Defendants' conduct (3) that a favorable federal court decision likely would redress or remedy." *Oak Ridge Care Center, Inc. v. Racine County*, 896 F.Supp. 867, 871 (E.D. Wis. 1995), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Congress frequently expands standing in connection with civil rights statutes, see *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 212 (1972) (expanded standing under Fair Housing Act), and has clearly done so in the ADA. *Oak Ridge Care Center*, 896 F.Supp. at 872.

The outer limits of standing are represented by the "tester" situation. That is where an individual does not even have any intent to avail him or herself of the item or activity in question, but pretends to seek it in order to determine whether an act of discrimination will occur. The United States Supreme Court had held in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982), that the Fair Housing Act supported "tester" standing. According to *Havens*, the FHA statute "creat[ed] legal rights, the invasion of which creates standing." *Id.* at 373. It is

enough for the tester to suffer this technical injury. The Tenth Circuit held that this analysis also applies to the ADA:

> Thus, the totality of Title II's plain language, the plain language of its enforcement provision, and the statutory scheme's anti-discrimination purpose lead this court to conclude that Congress intended Title II to confer standing to the full limits of Article III. Cf. *Havens Realty*, 455 U.S. at 372-74, 102 S.Ct. 1114.

*Tandy v. City of Witchita*, 380 F.3d 1277, 1287 (10th Cir. 2004). The court held that the standing requirements of §504 were equally expansive. *Id.* The Second Circuit had earlier reached the same result in *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997). It held that use of the broad language, "any person alleging discrimination", in 42 U.S.C. §12133 essentially dispensed with any requirement of standing beyond alleging an ADA violation. *Id.* As for the claims under 42 U.S.C. §1396(a)(30)(A), the Seventh Circuit has held that the standing requirements under general Medicaid law, the ADA and §504 were similarly expansive. *Bruggeman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003)

Actions for declaratory judgment involve the lowest standing threshold. "[I]n some instances a declaratory judgment is proper even though there are future contingencies that will determine whether a controversy ever actually becomes real." 10B Wright, Miller & Kane, Federal Practice and Procedure, §2757, at 476 (3d ed. 1998). Judicial relief may be ordered before any harm occurs precisely "to avoid the dispute escalating into additional wrongful conduct." *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F.Supp. 2d 394, 405 (S.D.N.Y. 2002). A declaratory judgment may completely resolve a dispute or may be a "prelude" to other relief. *Bontkowski v. Smith*, 305 F.2d 757, 761 (7th Cir. 2002). "[B]y seeking just the declaration the plaintiff avoids the burden of formulating and justifying a precise injunctive remedy." *Id.*

An injury "in the probabilistic sense" is all that is required to have standing to seek declaratory or injunctive relief. *Cook, Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 744 (7th Cir. 2003). The Seventh Circuit has said:

> [S]tanding does not require a perfectly clear title to the claim sued upon. *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 75, 78-79 (2d Cir.2002); *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1204 (10th Cir.2001). This is a corollary of the probabilistic character of the requirement of standing, upon which we have commented in other cases, such as *Diaz v. Duckworth,* 143 F.3d 345, 347 (7th Cir.1998), and *Price v. Pierce*, 823 F.2d 1114, 1118 (7th Cir.1987); see also *Hohn v. United States*, 262 F.3d 811, 818 (8th Cir.2001). "A reasonable probability that a plaintiff will get an apartment that he wants sooner if he wins his suit is a sufficiently tangible expected benefit of suit to confer standing under the liberal principles that prevail nowadays," as we said in *Price*; . . .

*Morlan v. Universal Guar. Life Ins. Co.*, 298 F. 3d 609, 620 (7th Cir.2002). As the following sections will discuss, both the allegations in plaintiffs' complaint and their factual submissions demonstrate a substantial likelihood that they will be harmed by the alleged violations of federal law that they have identified in the Family Care program.

## A. Group home residents have a legitimate interest in continuing to live in a particular home of their choice

At the heart of the standing issue is a fundamental disagreement between the plaintiffs and defendants about whether group home residents have an interest in remaining in a particular home. MCDA considers Family Care clients to be like interchangeable pegs that can be moved around a board. However, the complaint alleges that group home residents have important associations with others in the home and at their day programs that will be lost if they are shifted to another CBRF. [4th Amd. Cmplt. ¶¶21-22]. It also alleges that each of the plaintiffs will be individually harmed. See [4th Amd. Cmplt. ¶¶78-79]. Each of the three affidavits addresses these points. [Cook: ¶¶50-53]; [Burr-II: ¶¶21-23]; [Kallas: ¶¶10-13].

The defense point of view is just that, a point of view. Plaintiffs have sufficiently alleged an interest in remaining in their homes that supplies standing in this case.[4]

**B.      The individual plaintiffs have standing.**

A Medicaid provider, ". . . has standing, <u>along with the patients themselves</u>, to challenge in federal court laws that forbid it to sell its services to potential customers or limit the prices it can charge." *Bethesda Lutheran Homes v. Leann*, 122 F.3d 443, 444 (7th Cir. 1997) (citations omitted) (emphasis supplied). Medicaid recipients were held to have had standing to challenge various aspects of an Illinois Medicaid plan under 42 U.S.C. §1983, the ADA and §504 even though the requested relief might not benefit actually benefit them:

> They seek merely a plan, which might not lead to an increase in the ICF/DD capacity in their immediate area. Even if it did, they might not benefit. . . .  The potential benefit to them from the relief that they seek thus is speculative.
>
> But not so speculative as to negate standing, which is a matter of probabilities rather than certainties. *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1242 (7th Cir. 1991). The suit seeks to remove a logjam that is preventing the creation of facilities desired by the plaintiffs, and if the likelihood of success is conjectural so is the argument for failure based on the possibility that any new facilities will be overwhelmed by other applicants.

*Bruggeman*, 324 F.3d at 910. This is a good description of the situation in virtually every Medicaid or *Olmstead* type case. The plaintiffs in *Fisher* avoided summary judgment on their integration claim based on evidence of a "high risk of premature entry into a nursing home." 335 F.3d at 1184.

---

[4] There is another issue lurking here. The defendants have gone out of their way to paint an attractive picture of Family Care and all of its components. Their argument seems to be that Family Care will take care of any problems caused by a transfer and residents have an appeal procedure to protect them. Plaintiffs are skeptical based on information such as that contained in the SRCA memo. However, the important legal issue is that there is no exhaustion requirement under the Title II and §504 so the plaintiffs are free to bring these claims regardless of the availability of an internal hearing or some other procedure. *Dertz v. City of Chicago*, 912 F.Supp. 319, 324 (N.D. Ill. 1995).

We have a wealth of information about the probabilities in this case based on the overall funding problems in the Milwaukee County system. There are separate paragraphs in the complaint alleging the harm to each plaintiff. [4th Amd. Cmplt. ¶¶78-79, 89-90, 99-100, 108-109, 118-119, 126-127). We also have expert affidavit testimony that the individual plaintiffs are likely to suffer harm including institutionalization. [Cook: ¶25]. This was found to be sufficient in *Fisher*, 335 F.3d at 1181-1182, and it is more than enough to supply individual standing here.

### C. The putative class members have standing.

Class actions frequently are aimed at a policy that limits access to a particular benefit, even where not all members could receive (or would even want) the desired object. For example, in a case involving a veterans hiring preference policy, the court noted that there were only a few potential jobs compared to the size of the class, but: "[e]ach class member is better off when the preference is being enforced than when it isn't. They may not get the job, but they are guaranteed the preference." *Veterans Legal Defense Fund v. Schwartz*, 330 F.3d 937, 939 n.2 (7th Cir. 2003); see *Uhl v. Thoroughbred Technology and Telecommunications, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002) (each class member had 50% chance of suffering the harm). In the same vein:

> When the government erects a barrier that makes it more difficult for members of one class to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

The plaintiffs have alleged all of the elements of a class action. [4th Amd. Cmplt. ¶¶129-137]. If necessary, the Court can look to these in order to determine standing using a larger

potential pool of individuals that are likely to suffer harm. Based on the allegations of the complaint and the affidavits, large numbers of persons with disabilities in Milwaukee County are now facing and will in the future face the same loss of established residences as the individual plaintiffs due to the rate policies in Family Care.

> **D. If the issue cannot be resolved in plaintiffs' favor at this stage of the proceedings, the portion of the defense motions relating to standing should be denied with leave to refile after class certification is resolved.**

Plaintiffs contend that the standing question can be decided in their favor based entirely on the allegations in the complaint and that this final step is unnecessary. However, if the Court reaches this stage, it should deny the State's motion in regard to standing and take up the class certification issue. Deciding whether a case may be maintained as a class action is "the first order of business." *Hart v. Michael Sheahan*, 396 F.3d  at 894 (citations omitted). Class certification must be resolved prior to any issues of standing. *Payton v. County of Kane*, 308 F.3d 673, 681 (7th Cir. 2002). Plaintiffs had agreed with the defense that it would be more efficient to hold the class certification issue in abeyance until the issues concerning the legal sufficiency of the fourth amended complaint were decided. Obviously, this will not work if the answer to the standing question depends on the existence of a certified class. In that event, the standing question should be deferred until after plaintiffs renew their motion and the class certification issue is resolved.

## II. Plaintiffs' claims for injunctive relief which may result in an order directing the State defendants to increase future capitated rates payable to Milwaukee County are not barred by the Eleventh Amendment.

There are three exceptions to the Eleventh Amendment bar against suits naming states or state agencies as defendants: (a) where the state has consented to suit in federal court. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985); *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir. 1997); (b) where a party sues a state official for prospective injunctive or

declaratory relief from an ongoing violation of federal law, *Ex Parte Young*, 209 U.S. 123, 159-60 (1908); and (c) where Congress has properly abrogated state immunity, *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55-6 (1996).

### A. There is no State immunity for claims under §504.

Voluntary participation in a funding program authorized by Congress waives state immunity. *Seminole Tribe*, 517 U.S. at 65. The Seventh Circuit has held that §504's funding mechanism does create a valid waiver of Eleventh Amendment immunity and that it may be enforced in federal court against state agencies. *Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000). The State acknowledges this. (State Brf., at 23). A plaintiff may seek compensatory damages directly from a State agency under §504. Even if the demand that future Family Care rates must account for past shortfalls in Milwaukee County should present problems under the plaintiffs' other legal theories, it may proceed under the Rehabilitation Act.

### B. *Ex Parte Young* permits an action for injunctive relief against the State defendants under all three federal statutes.

A suit for injunctive relief against State officials is one of the specific exceptions to Eleventh Amendment immunity. *Ex Parte Young*, 209 U.S. at 159-60. The *Ex Parte Young* doctrine comes into play at the pleading stage and does not include any analysis of the merits. *Verizon Maryland, Inc. v. Public Service Comm. of Maryland*, 535 U.S. 635, 646 (2001), citing, *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997). A court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly described as prospective." *Coeur d'Alene*, 521 U.S. at 296; *Ameritech Corp. v. McCann*, 297 F.3d 582, 587 (7th Cir. 2002). The actual role of the state official is not crucial. Suits of this type "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

*Ex Parte Young* applies not only to violations of constitutional law, but also to suits alleging violations of federal statutory law, *Verizon*, 535 U.S. at 648 (Telecommunications Act), and more specifically to cases brought under the ADA and §504. *Bruggeman*, 324 F.3d at 912.

The distinction between prospective relief and past damages is not as clear as "night and day." *Edelman v. Jordan*, 415 U.S. 651, 667 (1974). A State may be ordered to conform its conduct to federal law without trespassing on "the "Eleventh Amendment even though accompanied by a substantial effect on the state treasury." *Papasan v. Allain*, 478 U.S. 265, 278 (1986). The Ninth Circuit found no Eleventh Amendment obstacle in a case by Medicaid recipients claiming that tobacco settlement proceeds were being miss-allocated by the State. *Cardenas v. Anzai*, 311 F.3d 929, 938 (9th Cir. 2002). It held that "[t]he fact that the plaintiffs' claims depend in part upon past conduct by the state . . . is not dispositive." *Id.*

As discussed elsewhere, the complaint alleges violations of the ADA, §504 and the Medicaid statute that are clearly ongoing and expected to continue into the foreseeable future. The relief sought is not "damages" since plaintiffs are seeking no financial payments to themselves. The case does involve financial payments going forward and plaintiffs have included in their prayer for relief "that future rates set by the State defendants include an amount sufficient to alleviate the shortfall in Milwaukee County's Family Care program caused by inadequate capitated rates from 2000 through the present." [4th Amd. Cmplt., Conclusion ¶¶F &G]. If plaintiffs prevail, this Court will be entering an order directing the State to cease any violations of federal law and conduct itself accordingly. This would include how it expends funds in the future and any proper consideration of rates for Milwaukee County disability providers would have to include the effect of past-underfunding in order to have any validity. This does not convert plaintiffs' claims for prospective relief into a damages claim.

The court's decree in *Ball v. Biedess* provides an excellent example of the type of order the plaintiffs are seeking here. The principal provision says:

> It is further ordered that the AHCCCS program must offer a rate of pay to health care workers so as to deliver adequately those services for which each individual qualifies; that is, to attract enough health care workers to deliver all of the services for which an individual qualifies.

2004 WL2566262. The defendants still retain substantial authority about how to effectuate the order. The Arizona district court also allowed the parties to submit proposals for an effective date for the relief order which is an excellent idea in any systemic litigation. Assuming the entry of some similar relief in this case, there will be no immunity problem. More importantly at this stage as required by *Verizon*, the relief requested in the complaint does not implicate the Eleventh Amendment

## C.    Plaintiffs are not pursuing any ADA or Medicaid claims other than those coming under the *Ex Parte Young* doctrine.

Plaintiffs believe that Congress did validly abrogated State immunity in Title II under the standard in *Tennessee v. Lane*. Abrogation under the Medicaid statute is a more difficult question. However, neither of these issues will be here because the State defendants would be able to take an immediate appeal from a ruling in the plaintiffs' favor. This would create an unfortunate delay. The providers who serve the clients in this case are concerned about their welfare and they are staying with the Family Care program as long as possible. This will not continue. Plaintiffs can obtain the relief they seek under the ADA and 42 U.S.C. §1396a(a)(30)(A) by way of the *Ex Parte Young* doctrine. They may seek any potential relief under §504 unencumbered by the Eleventh Amendment.

## <u>CONCLUSION</u>

The defendants have a huge burden here. They must show that the claims are legally insubstantial or that plaintiffs cannot prove any set of facts in support of those claims. The defense has simply failed to carry that burden. All of plaintiffs' legal claims in the fourth amended complaint should be permitted to go forward. The Court should also hold that the Eleventh Amendment is not an impediment to plaintiffs claims under the ADA, §504 and 42 U.S.C. §1396a(a)(30)(A). The Court should also deny the defendants' motions to dismiss for lack of standing.

Date:   July 22, 2005

Respectfully submitted,

ROBERT THEINE PLEDL
Attorney for the Plaintiffs

/s/   Robert Theine Pledl_____
State Bar No. 1007710
1110 N. Old World Third Street, Suite 670
Milwaukee, Wisconsin   53203
TEL    414-225-8999
FAX    414-224-0811
EMAIL pledl@sbcglobal.net