UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

GERALD NELSON, et al.,

                Plaintiffs,

     vs.                                                                         Case No. 04-C-0193

MILWAUKEE COUNTY, et al.,

                Defendants.
_____

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO MILWAUKEE COUNTY'S MOTION FOR JUDGMENT ON THE PLEADINGS**
_____

**INTRODUCTION**

      The State and County defendants have argued that the plaintiffs lack standing to assert a right to remain in their current residential placements. One aspect of this issue relates to the plaintiffs' claims under the integration provisions of the Americans with Disabilities Act and §504 of the Rehabilitation Act. Plaintiffs have alleged that the State and County policies at issue expose them to an imminent threat of institutionalization. See *Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175, 1185 (10th Cir. 2003) (case allowed to proceed based on showing that "[s]ome will eventually end up in a nursing home."). Plaintiffs' earlier arguments and submissions, along with the John Villegas-Grubbs affidavit, are sufficient to address this issue.

      The other aspect of the plaintiffs' right to remain in their current homes is somewhat different. They are claiming harm even if the anticipated forced moves do not lead to institutionalization. In support of this theory, the plaintiffs have alleged that the choice of a particular group home is based on a number of factors including the characteristics of the home

itself as well as its proximity to various features in the surrounding community of interest to the particular resident. [4th Amd. Cmplt. ¶¶20-21]. Each of the named plaintiffs selected their current residence for a reason and they wish to remain in their chosen home. The plaintiffs have also alleged that "many individuals with disabilities develop attachments to the other clients and to particular staff members." [¶22]. Each of the plaintiffs alleges that it "would be very traumatic and harmful" to be "forcibly removed" from their homes. [¶¶78, 89, 99, 108, 118, 126].

The affidavits show that plaintiffs will be able to introduce evidence in support of their claim that lateral moves to other group homes will be harmful. [Miller ¶9: "[Joan Bzdawka] has friendships with other clients and with staff. I would like her to continue residing at Arbor House and attending the Paragon day program."]; [Burr I ¶¶9-14, 34: "We believe that it would also be traumatic for Gerald, Joan B., Marilyn B., Sandra E. and the HIL residents who will be turning 60 in the near future if they were forced to leave their homes and day programs."]; [Burr II ¶21: "Any person with a developmental disability is at a greater risk of deterioration whenever their residence or other program changes."]; [Kallas ¶¶7-8, 10-11: "There is also a one-third increase in mortality each time elderly residents are relocated to a new facility."]; [Cook ¶¶50-51: "The potential for real harm exists when a person with extensive support needs transfers to another community-based facility without the history that has been developed by the facility they left."].

The defendants argue that lateral movements between group homes are not actionable:

> Plaintiffs have failed to cite any authority for the proposition that this Court has the authority under the ADA, the Rehabilitation Act or the Medical Assistance ("MA") statutes to require that plaintiffs remain in a particular or specific community placement, if, as plaintiffs' residential providers threaten here, those providers no longer participate in the Family Care program. (State Brf. at 8).

> . . . all that can be discerned from the allegations of the Fourth Amended Complaint with regard to impact of defendants' alleged disparate treatment of the plaintiffs is that it might result in a move from one community placement to another . . . (County Brf. at 5-6).

2

> . . . plaintiffs are threatened with nothing more than a move to a different community placement. (State Brf. at 9).

The defendants are correct that there is no case law directly on point under the ADA, §504 or the MA statutes regarding this issue, however, this does not mean that plaintiffs have no legally protected interest in remaining in their current homes. The following will show that they have a legitimate legal right to remain in their homes and have standing to assert that right.

## ARGUMENT

**I.     Group home residents have a legally protected interest in continuing to live in a particular home of their choice.**

The defendants as moving parties bear the burden of proving that "no legally cognizable claim for relief exists." 5B Wright & Miller, Federal Practice and Procedure, Civil 3d §1357, at 462 (2004). In analyzing a motion under Rule 12(b)(6), "[t]he district court should be especially reluctant to dismiss on the basis of the pleading when the asserted theory of liability is novel or even 'extreme,' since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions." Wright & Miller, supra. at 692. The same principle applies to motions for judgment on the pleadings. 5C Wright & Miller, supra. at 222.

In *Reed v. Monahan's Landscape Co.*, 2004 WL 422686, No. 03 C 7081 (N.D. Ill. March 4, 2004), Judge Zagel found only one case from another circuit that peripherally addressed the issue raised by a motion to dismiss. Rather than decide the issue on that basis, the motion was denied so that it could be appealed later "on a fully developed factual record." *3. In the same vein, the First Circuit reversed a Rule 12(b)(6) dismissal in a novel voting rights case because:

> As courts get more experience dealing with these cases and the rules firm up, it may be more feasible to dismiss weaker cases on the pleadings, but in the case before us we think that the plaintiffs are entitled to an opportunity to develop evidence before the merits are resolved.

*Metts v. Murphy*, 363 F.3d 8, *11 (1st Cir. 2004) (en banc).

3

In order to support a novel claim, "[t]he plaintiff has to show that while her legal claim has no basis in existing law, or at least the law's current pigeonholes, it lies in the natural line of the law's development and should now be recognized as part of the law." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1042 (7th Cir. 1999) (emphasis in original). There are no cases specifically dealing with the right to live in a particular group home and the Court must look elsewhere to determine whether plaintiffs have a legitimate interest that is recognized under federal law. See *J.H. ex rel. Higgins v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) (state law may not create causes of action under §1983).

Various cases have noted the unique role that group homes play in the lives of persons with disabilities. See *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 787 (7th Cir. 2002) ("group living arrangements can be essential for disabled persons who cannot live without the services such arrangements provide, and not similarly essential for the non-disabled."); *Brandt v. Village of Chebanse*, 82 F.3d 172, 174 (7th Cir. 1996) ("joint living arrangements are essential"); *Erdman v. City of Fort Atkinson*, 84 F.3d 960, 963 (7th Cir. 1996) ("[l]iving together in groups of that size is claimed to be therapeutic and is also the only way most of the residents can live in a single-family home."); *Oconomowoc Residential Programs, Inc. v. City of Greenfield*, 23 F.Supp.2d 941, 958 (E.D. Wis. 1998) ("[t]he developmentally disabled people ORP serves are not able to live independently, so the CBRF is one mode of ameliorating their inability to live independently by enabling them to live in small groups with nonresidential caretakers."); *Smith & Lee Associates, Inc. v. City of Taylor, Michigan*, 13 F.3d 920, 931 (6th Cir. 1993) ("the handicapped may have little choice but to live in a commercial home if they desire to live in a residential neighborhood."). The strong feelings that residents may have about their group home are illustrated by the plight of Valerie D., a putative class

member that lives in an HIL home. [Burr-II ¶13]. She was one of the individual plaintiffs in *Oconomowoc Residential v. Milwaukee.* After a lengthy legal battle to live in her current home, her continued residence is now threatened due to funding because she turned 60 in 2004. *Id.*

There is no question that persons with disabilities have a vital, legally protected interest in living in a group home. The disputed issue is whether they have a right to a particular group home. The *Erdman* case discussed this concept:

> In our case, the district court concluded that what the plaintiffs must show is inequality of opportunity to live in the <u>city</u> of Fort Atkinson. We express skepticism about that interpretation of a statute [the Fair Housing Act] which refers specifically to inequality of opportunity to live in a <u>dwelling</u> . . . But for reasons which we now explain, we need not answer the question as to whether a city's providing handicapped housing somewhere within its borders is sufficient to satisfy the [FHA].

84 F.3d at 963 (emphasis in original). There is no principled reason to distinguish state and local zoning policies that restrict access to particular dwellings in violation of the FHA from state and local funding policies that restrict access to particular dwellings in violation of the ADA, §504 and the Medicaid statutes. This passage supports the plaintiffs' position that there is a federally recognized right to live in a particular group home as opposed to just a similar type of group home "somewhere." The reasoning in *Erdman* is persuasive even if it is dicta.

The plaintiffs are not seeking to remain in their current homes simply because they like the physical attributes or ambiance of a particular structure.[1] They have alleged that group home residents form attachments within the home and at their day programs and that each of the named plaintiffs will be harmed by the loss of these various relationships. [4th Amd. Cmplt. ¶¶22, 78, 89, 99, 108, 118, 126]. It is the impending termination of these significant relationships that implicates additional legal rights that have been recognized in other contexts.

---

[1] Plaintiffs are not conceding that liking a particular group home, standing alone, is an insufficient basis to support a claim. Persons under 60 and residents of other counties can choose to remain in their current group home for any reason whatsoever. The point is that the plaintiffs have also alleged additional factors which certainly state a claim.

5
Case 2:04-cv-00193-LA   Filed 09/09/05   Page 5 of 10   Document 84

Plaintiffs had elected not to pursue any substantive constitutional claims in this case since they would be subject to rational basis review rather than the heightened requirements of the federal disability statutes. *Oconomowoc Residential v. Greenfield*, 23 F.Sup.2d at 953. However, if a particular relationship is entitled to constitutional protection, it should receive similar recognition under the federal laws that have declared persons with disabilities to be a protected class entitled to special legal status. *Id.*; 42 U.S.C. §12101; 29 U.S.C. §701(a); see *Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (discussing 42 U.S.C. §12101(b)(1) & (b)(4). This "lies in the natural line of the law's development" pursuant to *Kirksey*, 168 F.3d at 1042.

The United States Supreme Court recognized the expansive nature of the concept of "family" in *Moore v. City of East Cleveland*, 431 U.S. 494 (1977). Overturning a zoning ordinance that prohibited more distant family members from living with each other, the plurality observed that relatives beyond the scope of the nuclear family have historically chosen to live together "[e]specially in times of adversity, such as the death of a spouse or economic need." *Id.* The principal reason that people live in group homes is that they require care beyond that which most families can provide. *Oconomowoc Residential v. Milwaukee*, 300 F.3d at 787 (group home residents "require a living situation where supportive services are available twenty-four hours per day.") Their only opportunity for a semblance of family life is in a group home.

It is not necessary that group home residents be determined to actually constitute a family in order to have a legally protected interest in the continuation of their relationships within the home. The Supreme Court "has recognized that the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights." *Bd. of Dir. of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987). This is not limited to family relationships. *Id.*; *Marcum v. McWhorter*, 308 F.3d 635, 640 (6th

Cir. 2002). The liberty interest extends to other relationships that "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin or maintain the affiliation, and seclusion from others in crucial aspects of the relationship." *Roberts v. United States Jaycees*, 468 U.S. 609, 620 (1984). The relevant factors in determining whether certain relationships are entitled to constitutional protection are "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id.* Neither the Jaycees nor the Rotary Club could meet the standard because they admitted virtually anyone (except women, which was the point of the litigation) and often invited the public to meetings. *Roberts*, 468 U.S. at 621; *Bd. of Dir. of Rotary International*, 481 U.S. at 546-7. There was a continuous "flow of prospects" to replenish the membership because of high turnover. *Id.*

This Court's task is to determine "where [a particular] relationship's objective characteristics locate it on the spectrum from the most intimate to the most attenuated of personal relationships." *Id.*, 468 U.S. at 620. The reasons that the Supreme Court gave for denying protection to the Jaycees and the Rotary are precisely why group home residents <u>do</u> have a protected interest.

First, group homes are small. HIL's homes in Milwaukee County serve 4-6 residents. [Burr-II ¶10]. SRCA's homes each serve 20 residents. [Kallas ¶4].

Second, considering purpose, policies and selectivity together, there is a painstaking admission process, [Burr ¶8-10]; [Kallas ¶9], in order to assemble a group of residents who are able to live together in a "family" atmosphere. [Kallas ¶11]. The complaint alleges:

> (21)   A great deal of care goes into choosing a residential facility or a day program. Individuals may be referred to a particular provider by a county caseworker based on the general characteristics of the person and the facility or program, but that would only be the beginning of the process. Many individuals/guardians/agents choose a facility or program based on its proximity to family, friends, recreational activities, church and a variety of other community

> activities. Provider staff, the guardian/agent and the individual himself or herself also try to determine in advance whether the client will get along well with both staff and other residents and participants in terms of personalities and similar interests. The inability of certain residents to get along with each other is likely to lead to another move. That is the reason that so much attention is paid to choosing compatible residents, participants and staff. Certain individuals also have special or unusual service needs that could require a specialized service provider. All of these factors could affect the choice of a particular facility or program.
>
> . . .
>
> (25)  Given the complexity of locating and arranging suitable services, obtaining the approval of the person and/or guardian/agent, getting through the initial period of adjustment and the development of relationships by the client, there is a general preference among families, guardians, agents, service providers, county agencies and the clients themselves for remaining in a particular residential setting and day program.

[4th Amd. Cmplt.]. Many components of the admission process are actually prescribed by law. HFS §83.32 (CBRF) and §88.06 (AFH), Wis. Adm. Code.

Third, in regard to "congeniality", plaintiffs have alleged that group home residents develop important attachments to staff and other clients. [4th Amd. Cmplt. ¶22]; [Burr ¶12]; [Kallas ¶10]. "The whole purpose is to develop a sense of living together and working together as a family." [Burr ¶12].

There are other factors as well. These are private homes that are not open to the public so they clearly meet the seclusion test. *Roberts,* 468 U.S. 609 at 620. And, any relationship that involves sharing a kitchen, living room or bathroom is clearly at the intimate end of the Supreme Court's spectrum. *Bd. of Dir. of Rotary International*, 481 U.S. at 546-7

The bottom line is that group home residents associate in ways that closely resemble the family relationships that have historically been granted Constitutional protection. They live in group homes because they cannot live in conventional family groups because of their need for disability services. If plaintiffs happened to be a few years younger or if they lived in a different Wisconsin county, they would be able to choose their homes and their housemates without the

8

constraints that result from the government actions at issue in this litigation. Plaintiffs have alleged that it violates the letter and spirit of the federal disability laws to treat the plaintiffs and the putative class differently from these others who are similarly situated except for the happenstance that places them in a different funding program. The relationships that group home residents have with each other and with staff clearly meet the standard for a protected liberty interest and, therefore, also provide a legitimate foundation for the relief that plaintiffs seek under the ADA, §504 and the Medicaid statutes.

**II.     Plaintiffs have standing based on a substantial likelihood that they will be forced from their current group homes based on the financial condition of residential providers in Milwaukee County.**

Plaintiffs have sought leave to file the expert report of John Villegas-Grubbs to show that they will be able to introduce evidence in support of the allegations that the Family Care funding scheme has a negative impact on Milwaukee County residential providers that will lead to the involuntary relocation of the individual plaintiffs and other Family Care clients. [4th Amd. Cmplt. ¶¶34, 59-64]. The JVG report is in addition to the Cook affidavit. [¶¶27-34, 49].

The defendants object to any consideration of the affidavits and factual materials submitted by the plaintiffs. However, the Seventh Circuit is known for its acceptance of additional factual submissions by plaintiffs in response to Rule 12(b)(6) motions. 5B Wright & Miller, supra., at 777, citing *Smith v. Boyle*, 144 F.3d 1060 (7th Cir. 1998) (other citations omitted). The recent case of *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, --- F.3d ---, 2005 WL 2100530, \*6 (7th Cir. September 1, 2005), reaffirmed that additional facts may be submitted throughout the proceedings and even on appeal in response to a dismissal motion. It also restated the liberal principles of standing in cases based on probable harm consistent with the discussion in the plaintiffs' original brief. *Id.* at \*6.

9

The substantial likelihood that the individual plaintiffs, as well as the putative class members, will suffer imminent harm from the actions of the defendants is more than sufficient to provide standing to proceed on the claims in the fourth amended complaint.

## CONCLUSION

The defense has failed to carry its burden of showing that the plaintiffs' claims are legally insubstantial or that they cannot prove any set of facts in support of those claims. All of plaintiffs' legal claims in the fourth amended complaint should be permitted to go forward.

Date:   September 9, 2005

>Respectfully submitted,
>
>ROBERT THEINE PLEDL
>Attorney for the Plaintiffs
>
>/s/   Robert Theine Pledl_____
>State Bar No. 1007710
>1110 N. Old World Third Street, Suite 670
>Milwaukee, Wisconsin   53203
>TEL    414-225-8999
>FAX    414-224-0811
>EMAIL pledl@sbcglobal.net